RAYEX CORPORATION, a corporation of the State of New York, Ray Tunkel, Harry Kramer and William Jonas, Petitioners,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 194, Docket 27583.

United States Court of Appeals Second Circuit.

Argued Jan. 14, 1963.

Decided May 7, 1963.

Gilbert Ehrenkranz, Orange, N. J. (Bernard Hellring, David Landau, Hellring, Lindeman & Lieberman, Newark, N. J., of counsel), for petitioners.

James McI. Henderson, Gen. Counsel, Federal Trade Commission, Washington, D. C. (J. B. Truly, Asst. Gen. Counsel, Richard Wittington Whitlock, Atty., Federal Trade Commission, Washington, D. C., of counsel), for respondent.

Before MEDINA, WATERMAN and MOORE, Circuit Judges.

MOORE, Circuit Judge.

This is a petition to review and set aside portions of an order of the Federal Trade Commission directing petitioners Rayex Corporation and Ray Tunkel, Harry Kramer and William Jonas, individually and as officers of the corporation, to cease and desist from engaging in certain unfair and deceptive practices found to be in violation of the Federal Trade Commission Act, 15 U.S.C. § 45(*l*). The only questions presented for review relate to that portion of the order directed at petitioner's practice of preticketing the price of its sunglasses, and to the propriety of including Kramer and Jonas in the Commission's order.[1]

---

1. The Commission's order in relevant part reads:

" * * * that in the sale of any merchandise, in commerce, as 'commerce' is defined in the Federal Trade Commission Act, respondents do forthwith cease and desist from the act or practice of preticketing merchandise at an indicated retail price, or of otherwise conveying an impression to the public concerning re-

■ Preticketing, as defined by the Commission in this case, is "the practice whereby manufacturers and distributors attach to their goods distinctive labels or stickers, bearing prices and other information, prior to passing them on to the dealers who sell to the general public." Although there is nothing illegal *per se* about the practice, see Baltimore Luggage Co. v. FTC, 296 F.2d 608 (4th Cir. 1961), cert. denied, 369 U.S. 860, 82 S.Ct. 949, 8 L.Ed.2d 17 (1962), a preticketing policy can lead to deception when dealers habitually market a product at substantially less than the preticketed price. The courts have been quite unanimous in upholding the Commission's position that in such circumstances the tendency of preticketing is to beguile the public into thinking that they are getting a "bargain" and that this constitutes an unfair method of competition. Baltimore Luggage Co. v. FTC, supra; Clinton Watch Co. v. FTC, 291 F.2d 838 (7th Cir. 1961), cert. denied, 368 U.S. 952, 82 S.Ct. 395, 7 L.Ed.2d 386 (1962); Niresk Industries, Inc. v. FTC, 278 F.2d 337 (7th Cir.), cert. denied, 364 U.S. 883, 81 S.Ct. 173, 5 L.Ed.2d 104 (1960); Thomas v. FTC, 116 F.2d 347 (10th Cir. 1940).[2] Deception may also occur where the same product is preticketed at different prices in the same trade area. Again the preticketing creates an impression that the stated price is the customary one in the area and the customer is similarly victimized.

■■ There is no requirement that the Commission find an intent on the part of the manufacturer or distributor to deceive the public. See Bankers Securities Corp. v. FTC, 297 F.2d 403 (3d Cir. 1961). Such an intention, however, may be manifest when the manufacturer places different prices on the same product selling in the same area. If he engages in such practices, he may well act at his own peril in determining an appropriate trade area. When the same price is placed on articles for sale in a given trade area, the preticketer is not absolved from responsibility by virtue of the fact that it is the retailers, regularly selling at less than the stated price, who are abusing the practice. The manufacturer bears responsibility for placing a ready-made instrument of deception in the hands of such dealers. See FTC v. Winstead Hosiery Co., 258 U.S. 483, 494, 42 S.Ct. 384, 66 L.Ed. 729 (1922); C. Howard Hunt Pen Co. v. FTC, 197 F.2d 273, 281 (3d Cir. 1952).

■■ We are in complete agreement with the Commission and the other Circuits that this apparently prevalent practice is not to be condoned and that such deception of the buying public should be eliminated. The Commission nevertheless is still required to prove by substantial evidence that preticketing is being used in a proscribed manner by the particular respondent involved in any case. "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established." NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939).

■ In addition to the mere fact that a manufacturer or distributor pretickets prices, several other elements are necessary before Commission action is appropriate. In the first place, there

tail prices, when there is no generally prevailing retail price for such merchandise in the trade area, or when the indicated retail price is in excess of the prices at which such merchandise is sold at retail in a substantial segment of the trade area.

"And Further, that respondents do forthwith cease and desist from placing in the hands of jobbers, retailers, dealers, and others, means and instrumentalities by and through which they may deceive and mislead the purchasing public concerning any merchandise in the respects set out above."

2. The Commission argues that in addition to misleading the public as to the savings afforded by purchase at one particular store, a customer's belief that the preticketed price is the prevailing one in the trade area forestalls him from shopping elsewhere in the area to find it at a lower price and thus hinders competition.

must be proof of abuse within some given trade area. Preticketing at one price within one trade area and at another price in another trade area is not deceptive if, in fact, the product is sold at the preticketed price within the applicable trade area. Thus, for instance, it is not necessarily improper for articles to bear a preticketed price when distributed to Connecticut retailers that is different from a preticketed price upon identical articles distributed to Pennsylvania retailers. Secondly, there must be a showing that the product involved is sold at retail in a substantial segment of a market area at less than the preticketed price or that the product is preticketed at different prices for different dealers within the same market area. One or two isolated sales at less than the preticketed price is as equally probative of a valid "sale" on the part of the dealer involved as it is of a deceptive practice. Thirdly, there should be some consideration given to seasonal factors in determining whether the public is being defrauded. When the product is sold for the preticketed price during the peak season, it is a legitimate trade practice to sell the product at less than the preticketed price immediately following that season. At the same time abuse of this seasonal factor cannot be permitted. For example, if the same preticketed price is placed on an article all year round for a product which is sold at the preticketed price for only three months out of the year, preticketing may be deceptive.

Applying these principles here, to affirm on the basis of the record before us would make judicial review tantamount to a mere rubber-stamping of the findings of an administrative agency. The principal witness for the Commission was Mr. Spielman, a wholesaler of drug, sundry and speciality merchandise. He paid $9.00 a dozen for Rayex sunglasses preticketed at $4.95, and sold them to retailers for $14.40 a dozen, or $1.20 a pair. He testified that from his contact with the retailers to whom he sold these glasses, he could state that they retailed for somewhere between $1.98, $2.50 and the $4.95 price tag placed on them by Rayex. On cross-examination, referring to a style of sunglasses particularly popular in the "midtown area of New York" around Park and Madison Avenues, he stated that within that trade area, "they were probably selling them—I don't know this for a fact. They were probably selling them in and around $4.95." [3] However, he estimated that only about 25% of the sales in that area would be at the $4.95 price.

Mr. DePhillips, an attorney-examiner-investigator for the Commission, testified to a conversation with Spielman during the course of his investigation wherein Spielman said that the $4.95 price ticket "is a phony and a gimmick, the glasses probably retail for between $1.98 and

---

3. Spielman indicated that a high mark-up over the wholesale price on goods such as these would not be unusual:

"Q. What would you say that these sunglasses, Exhibit 3-B and the similar ones, were selling for in that trade area? A. They were probably selling them—I don't know this to be a fact. They were probably selling them in and around $4.95.

"Hearing Examiner Buttle: How do you know they were probably selling them for that price?

"The Witness: This is the kind of mark-up they sell them.

"(99) Hearing Examiner Buttle: What is the basis of your conclusion?

"The Witness: The basis of my conclusion, sir, is that the midtown area, drug stores, have tremendously high overhead. They are constantly on the look-out for what we call blind merchandise, that is, not branded, that does not have a fixed retail price, on which they can triple and quadruple their money.

"Hearing Examiner Buttle: In other words, what you are telling me is that it was customary to sell at a mark-up price; is that it?

"The Witness: In this particular area, this type of a store, yes. On a blind item they will always mark it well up. In fact, we have sold some twenty-nine cent items as high as eighty-nine cents and sixty-nine cents; that is merchandise that should sell for twenty-nine cents."

$2.50." DePhillips thereafter visited some of the retailers who had purchased from Spielman in order to ascertain the regular and customary price at which they sold sunglasses of this type. However, there was no testimony forthcoming from him as to any results of this investigation nor could he recall whether he had priced any glasses in the midtown area referred to by Spielman.

Another attorney-examiner, Mr. Tobin, also appeared for the Commission. His testimony related to a single purchase of a pair of Rayex glasses at the National Outlet Stores in Hartford, Connecticut, preticketed at $7.95 and sold to him for $2.95 plus tax.

The final evidence available to support this order was the response of Mr. Tunkel, President of Rayex, to a question about the range of prices on the labels furnished by Rayex. He stated that this depended "on what the customer requests". He also testified that "we have labels that say $1.98 and we have labels which sell for $19.95." Nothing in Mr. Tunkel's testimony indicates whether he was admitting to placing such disparate prices on the same sunglasses or was merely referring to the range of prices on different quality sunglasses manufactured by Rayex.

Upon the evidence adduced here, there has been no showing of actual recurrent and frequent sales within a given trade area at less than the preticketed price, no proof that dealers within the same trade area were requesting and receiving different price tags for the same glasses, and no effort to explore the effect of seasonal fluctuations on a product clearly susceptible to such variations. The isolated transaction in Hartford is of no probative value absent some proof that other retailers in the area were selling at less than the preticketed price. With respect to Spielman, his testimony was replete with statements casting doubt on whether much if any of his testimony was based on actual knowledge. The Hearing Examiner, referring to the Spielman testimony, stated that, "Even assuming that he was qualified, he only indicates with

probability. That evidence is rather weak." To the extent the Tunkel testimony is susceptible of the interpretation that Rayex was willing to place whatever price was requested by a dealer on the same sunglasses which were to be sold in the same trade area, there is some likelihood that the preticketing policy was being abused, but there was no showing that this actually occurred.

There is a total absence of any evidence concerning actual retail prices in any given sales area in New York City despite the fact that DePhillips was purportedly conducting an investigation of petitioner's preticketing policy. Apparently no real effort was made to support Spielman's charge that the $4.95 price sticker was a "phony" device.

The Commission itself has refused to issue cease and desist orders where the evidence has been so insubstantial. In Sun Gold Industries, 56 FTC 1368 (1960), two of the three witnesses called were primarily wholesalers who sold only a small proportion of respondent's hosiery at retail. The third witness was a manufacturer whose retail sales were solely an accommodation to the girls working at his factory. There the Commission found that "There is no evidence as to the amount of sales at retail by these witnesses, the percentage relationship of such sales to the total sales at retail of respondent's hosiery, nor that their witnesses were the only sellers of respondent's hosiery at retail in their respective trade areas." Id. at p. 1371.

■ There may have been sufficient evidence here to justify suspicion that a preticketing policy was being deceptively used and enough to justify investigation but such meagre proof is not enough to justify a cease and desist order. The words of the Seventh Circuit in Niresk Industries, Inc. v. F. T. C., supra are particularly appropriate here and bear repeating. The Court there stated:

"The Commission, as other administrative agencies, occupies a unique position which was unknown to common law jurisprudence. The Com-

mission wears all of the hats involved in the proceedings instituted under its authority. It is, at once, the accuser, the prosecutor, the judge and the jury. The wide scope of its discretion in the resolution of questions within its realm is founded and sustained by the courts upon the fact that its jurisdiction exists in a specialized field, wherein expertise is felt to be a necessity. Under those circumstances we feel that the Commission should assume a wider responsibility than that necessarily undertaken by a private litigant and substantiate its injunctive orders upon the concrete basis of a thorough investigation and full presentation of evidence whenever the existence of unfair or deceptive practices is charged against any respondent." Id. 278 F.2d at pp. 340–341.

■ Although we are reluctant to set aside the Commission's order without a remand, there being no indication that any additional evidence is available, and no motion having been made under 15 U.S.C. § 45(c), those portions of the Commission's cease and desist order directed at petitioner's preticketing practice must be set aside. Compare Ford Motor Co. v. NLRB, 305 U.S. 364, 59 S.Ct. 301, 83 L.Ed. 221 (1939); NLRB v. New York Merchandise Co., 134 F.2d 949 (2d Cir. 1943); NLRB v. American Tube Bending Co., 134 F.2d 993, 146 A.L.R. 1017 (2d Cir. 1943). The Commission's order is also modified in conformity with its concession on oral argument that Jonas, who neither personally engaged in Rayex's sales and advertising practices nor was in a position to exercise any control over such matters, was improperly included. As to petitioner Kramer, although he does not as a matter of practice have much voice in these matters, in view of the fact that he is a substantial stockholder, Vice-President, and is required during the absence of Tunkel to perform all the duties and exercise the powers of the President, we find that his inclusion was necessary if the order is "to be fully effective in pre-

venting the unfair competitive practices which the Commission had found to exist." FTC v. Standard Education Society, 302 U.S. 112, 120, 58 S.Ct. 113, 117, 82 L.Ed. 141 (1937); Standard Distributors, Inc. v. FTC, 211 F.2d 7 (2d Cir. 1954).

The order of the Federal Trade Commission is hereby set aside as to petitioner, William Jonas and as to these portions of the order directed at preticketing.